KRISTEN L. BOYLES (CA Bar # 158450)
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
(206) 343-7340
kboyles@earthjustice.org

GUSSIE LORD (D.C. Bar # 1009826)
*[Pro Hac Vice Application Pending]*
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
(720) 402-3764
glord@earthjustice.org

MONEEN NASMITH (NY Bar # 4427704)
*[Pro Hac Vice Application Pending]*
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 845-7384
mnasmith@earthjustice.org

THOMAS S. WALDO (AK Bar # 9007047)
*[Pro Hac Vice Application Pending]*
Earthjustice
325 4th Street
Juneau, AK 99801
(907) 500-7123
twaldo@earthjustice.org

*Attorneys for Plaintiffs*

NATHAN MATTHEWS (CA Bar # 264248)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5695
nathan.matthews@sierraclub.org

*Local Counsel and Attorney for Sierra Club*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUQUAMISH TRIBE, PYRAMID LAKE PAIUTE TRIBE, ORUTSARARMIUT NATIVE COUNCIL, COLUMBIA RIVERKEEPER, and SIERRA CLUB,<br><br>              Plaintiffs,<br><br> v.<br><br>ANDREW WHEELER, in his official capacity as Administrator of the United States Environmental Protection Agency; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,<br><br>              Defendants. | Case No. 3:20-cv-6137<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>(Clean Water Act, 33 U.S.C. § 1251 *et seq.*; Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*) |

INTRODUCTION

1.      Congress declared a single yet sweeping objective for the Clean Water Act ("CWA"): "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The Act embodies a cooperative federalism framework that empowers regulators at the federal, state, and tribal levels to work together to pursue this objective nationwide.  Section 401 of the Act is an integral component of this cooperative framework.  Through this provision, Congress ensured that states and authorized tribes could protect their waters and local environments by giving them broad power to grant, deny, or condition approval for a wide array of projects requiring federal licenses, permits, and approvals.

2.      The balance between the federal government, states, and federally recognized Indian tribes reached by Congress in Section 401 has worked well for decades.  In 1970, Congress passed Section 401's predecessor, section 21(b) of the Water Quality Management Act of 1970, which served a similar federalist purpose, delegating broad authority to states.  In

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 2 -

*Earthjustice*<br>*810 Third Ave., Suite 610*<br>*Seattle, WA  98104*<br>*(206) 343-7340*

passing the 1972 amendments to the CWA, Congress made only minor changes to the provision, and only one—a directive to EPA to establish test procedures for the analysis of pollutants that must be required in order to approve a project under Section 401—that bears on how the Section is implemented. Since the passage of the 1972 CWA amendments, Congress has hardly altered Section 401 at all because there was no reason.

3.      Recognizing Congress's intent, the Supreme Court, as well as lower courts, have interpreted the statute as granting wide latitude to states and tribes to condition and deny federal permits for environmentally harmful projects that result in discharges into local waters. The Environmental Protection Agency's ("EPA") guidance and implementing regulations pertaining to Section 401 have, since the provision's passage, echoed this view of expansive state and tribal authority. States and tribes around the country have come to rely on the consistent agency guidance and practice on Section 401. This status quo arrangement has worked well with tens of thousands of federal permits requiring certification every year by a state or tribe.

4.      Plaintiffs challenge a final rule promulgated by the EPA upending the longstanding regulations interpreting CWA Section 401. *Clean Water Act Section 401 Certification Rule*, 85 Fed. Reg. 42,210 (July 13, 2020) ("Section 401 Rule" or "Final Rule"). By promulgating the rule, EPA has upset the federal/state/tribal balance and substantially narrowed the authority of states and tribes to protect themselves from the harmful environmental impacts of federally licensed projects resulting in discharges into their waters. EPA has made these major revisions for reasons that are contrary to the objectives of the CWA, prioritizing the development of environmentally ruinous fossil fuel infrastructure over the integrity of the nation's waters.

5.      Plaintiffs Tribes are federally recognized Indian tribes. The Pyramid Lake Paiute Tribe was approved for "Treatment in the same Manner as a State ("TAS") for purposes of CWA Section 401 in January 2007. Plaintiff Tribes rely on Section 401 provisions that are essential for the protection of their waters, fisheries, and tribal resources. Plaintiff Tribes work either

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 3 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

directly or in cooperation with states and EPA to ensure that discharges into the waters they depend upon occur only in compliance with all relevant laws and regulations.

6.      Plaintiffs Columbia Riverkeeper and Sierra Club are environmental advocacy organizations that partake in Section 401 proceedings as part of their broader toolkits to protect the integrity of the Nation's waters.  For example, both organizations played significant roles in the campaign against the construction of the environmentally destructive Millennium Bulk Coal Terminal, a major fossil fuel project that was denied Section 401 certification.

7.      The Section 401 Rule exceeds the authority granted to EPA by Congress in the CWA.  As the Supreme Court has observed, the Act strikes a delicate balance between federal and state- or tribal-level regulators in accord with the principles of cooperative federalism.

8.      The Section 401 Rule is also arbitrary and capricious.  EPA failed to explain its decision to deviate from the agency's longstanding, prior interpretation of CWA Section 401, and EPA failed to consider important aspects of the problem, including the effects of stripping away a crucial tool of states and tribes seeking to protect waters and communities in their jurisdictions.

9.      The Final Rule was also promulgated without observing requisite procedures mandated by law.  Specifically, EPA failed to conduct meaningful consultation with tribal authorities as required by Executive Order 13,175, Consultation and Coordination with Indian Tribal Governments and EPA's May 2011 Policy for Consultation and Coordination with Indian tribes.

10.      For these violations of law, Plaintiffs ask the Court to vacate and set aside the Section 401 Rule, enjoin reliance on the Section 401 Rule, and reinstate the prior CWA regulations in force.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 4 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question).  This action is brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e), as some Plaintiffs reside, have offices, and have members in California, and many of the consequences of the defendants' violations of the law giving rise to the claims have occurred or will occur in this district.

INTRADISTRICT ASSIGNMENT

13.     This case is properly assigned to the San Francisco Division or the Oakland Division under Civil L.R. 3-2(c) because some plaintiffs and their members are located in counties within those districts.

PARTIES

A.     Plaintiffs

14.     Suquamish Tribe is a signatory to the 1855 Treaty of Point Elliott, one of the Stevens Treaties, named after the U.S. negotiator and Washington Territorial Governor Isaac Stevens.  In a series of treaties with the U.S. government in 1854 and 1855, the Indian tribes of what is now Puget Sound and the Washington coast ceded their aboriginal lands to the United States and retained or reserved certain lands, sovereignty, as well as fishing rights in their usual and accustomed fishing grounds, and hunting and gathering rights on open and unclaimed lands.

15.     The Suquamish Tribe is located on the Port Madison Indian Reservation in Suquamish, Washington and is in Kitsap County.  There are approximately 1,100 enrolled Suquamish Tribal members.  The Suquamish Tribe is a federally recognized Indian tribe with a governing body recognized by the Secretary of the Interior.  This action is brought by the

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 5 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Suquamish Tribe on its own behalf and on behalf of its members *parens patriae*.  By bringing this action, the Suquamish Tribe does not waive its sovereign immunity from suit.

16.     The Suquamish Tribe relies on land and resources in the Salish Sea and along its shorelines for traditional, commercial, economic, and cultural purposes.  The Suquamish Tribe's "usual and accustomed" treaty-reserved fishing grounds extend well beyond the Port Madison Reservation boundaries and includes marine waters of Puget Sound from the northern tip of Vashon Island to the Fraser River in Canada, including Haro and Rosario Straits, the streams draining into the western side of Puget Sound and Hood Canal.  The Suquamish Tribe actively protects all of its treaty-reserved natural resources through avoidance of impacts to habitat and natural systems throughout its aboriginal territory in Western Washington.  The Suquamish Tribe needs to ensure protection and restoration of the treaty reserved rights, resources, and habitats, and to safeguard the health, livelihoods, and wellbeing of Suquamish Tribal members for the next seven generations.

17.     Since time immemorial, the Suquamish have lived, fished, hunted, and gathered in this area.  Salmon and shellfish play a central role in the Tribe's subsistence, economy, culture, spiritual life, and day-to-day existence.  These treaty-reserved resources and the ability to continue traditional activities require a healthy ecosystem in the Salish Sea.  Members of the Suquamish Tribe use and enjoy areas throughout the Salish Sea to exercise their treaty-reserved fishing and shellfishing rights and for spiritual, cultural, aesthetic, subsistence, and commercial purposes.  The Suquamish Tribe is directly harmed by EPA's attempts to dilute the authority under CWA Section 401 of tribes eligible for TAS to review, set conditions upon, and deny federal licenses for activities that may discharge waters into its jurisdiction.

18.     When EPA proposed the challenged Section 401 regulation, the Suquamish Tribe submitted substantial and substantive comments.

19.     The Pyramid Lake Paiute Tribe is a federally recognized Indian tribe with approximately 2,288 enrolled members, based on the 477,000-acre Pyramid Lake Reservation

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 6 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

located thirty-five miles northeast of Reno, Nevada.  This action is brought by the Pyramid Lake Paiute Tribe on its own behalf and on behalf of its members *parens patriae*.  By bringing this action, the Pyramid Lake Paiute Tribe does not waive its sovereign immunity from suit.

20.     Pyramid Lake is a 125,000-acre terminus desert lake fed by the Truckee River which lies entirely within the boundaries of the Pyramid Lake Reservation.  As a terminus lake, Pyramid Lake has no outlet.  Pyramid Lake is an important and central cultural and spiritual resource of the Tribe, and also provides fishing and recreational activities that are a significant source of tribal employment and revenue.  In addition, Pyramid Lake is the only habitat in the world for the endangered Cui-ui fish, and also is prime habitat for threatened Lahonton Cutthroat Trout.  In its native Numu language, the Pyramid Lake Paiute people are called *cui-ui ticcutta*, which means Cui-ui eaters.

21.     The Pyramid Lake Paiute Tribe's application for TAS was approved by the EPA on January 30, 2007.  The Tribe developed and implements EPA-approved tribal water quality standards within the reservation—including the first water quality standards ever developed for Pyramid Lake.  The Pyramid Lake Paiute Tribe is directly harmed by EPA's attempts to dilute its authority under CWA Section 401 to review, set conditions upon, and deny federal licenses for activities that may discharge waters into its jurisdiction.

22.     When EPA proposed the challenged Section 401 regulation, the Pyramid Lake Paiute Tribe submitted substantial and substantive comments.

23.     Orutsararmiut Native Council is a federally recognized sovereign tribal government responsible for the health, safety, and well-being of its citizens in Bethel, Alaska, located along the Kuskokwim River.  Its mission is to promote the general welfare, enhance independence, encourage self-sufficiency/self-motivation, enhance quality of life, and preserve cultural and traditional values of the Tribe, and to exercise tribal authority over resources through educational, economic, and social development opportunities.  Orutsararmiut Native Council brings this action on its own behalf and on behalf of its citizens *parens patriae*.  By

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

bringing this action, Orutsararmiut Native Council does not waive its sovereign immunity from suit.

24.     Orutsararmiut Native Council has adopted a resolution opposing the proposed Donlin Gold Project and has engaged in administrative and legal processes associated with permits for the mine.  The Project would be located along a tributary to the Kuskokwim River upstream from Bethel and would be the world's largest single pure gold mine.  The proposed mine requires a CWA Section 404 permit from the U.S. Army Corps of Engineers, and accordingly, a Section 401 water quality certification from the state of Alaska.  Since submitting comments on the Alaska Department of Environmental Conservation's notice that Section 401 certification review was underway in July 2018, Orutsararmiut Native Council has remained engaged in the administrative process involved with Alaska's issuance of the Section 401 certification.  The issue is currently on appeal before an Alaska administrative law judge. Orutsararmiut Native Council asserts that Alaska may not issue the certification because it does not have reasonable assurance that the Project will meet the state's water quality standards for mercury and temperature or that existing uses for fish habitat will be protected.

25.     Orutsararmiut Native Council is vulnerable to environmental harm from changes to Section 401 as it depends upon the state to certify federally licensed activities.  For tribes without authority to implement tribal water quality standards, the Final Rule will limit the ability to provide input in determining whether to grant Section 401 certifications or developing conditions on 401 certifications that would serve to protect their interests from the impact of project actions.

26.     Columbia Riverkeeper is a non-profit, tax-exempt organization with approximately 16,000 members and supporters in Oregon and Washington.  Its principal place of business is in Hood River, Oregon.  Columbia Riverkeeper's mission is to protect and restore the water quality of the Columbia River and all life connected to it, from the headwaters to the Pacific Ocean.  To achieve these objectives, Columbia Riverkeeper operates scientific,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 8 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

1  educational, and legal programs to protect water quality, fish and wildlife habitat, and human

2  health throughout the Columbia River Basin.  Columbia Riverkeeper's vision is to restore clean

3  water and recover healthy, abundant populations of salmon and other species that support both

4  tribal and non-tribal fishing.  Columbia Riverkeeper's members, including member Diane L.

5  Dick, catch and eat fish caught in the Columbia River, drink water from the river, and recreate on

6  and along the river.

7         27.    Columbia Riverkeeper submitted comments on EPA's proposed CWA Section

8  401 regulations, and Columbia Riverkeeper and its members have been deeply involved in

9  Section 401 decisions for many years.  Most recently, on May 7, 2020, the Washington

10 Department of Ecology ("Ecology") issued Section 401 certifications with conditions to ensure

11 water quality standards were met for eight federal hydroelectric facilities on the Columbia and

12 Snake Rivers in Washington.  The U.S. Army Corps of Engineers challenged the CWA Section

13 401 conditional certifications before the state adjudicatory board; Columbia Riverkeeper has

14 moved to intervene to defend Ecology's Section 401 conditional certifications.

15        28.    Columbia Riverkeeper has also been focused on Ecology's CWA Section 401

16 certification denial for the Millennium Bulk Terminals—Longview project, a massive coal-

17 export terminal proposed along the banks of the Columbia River in Longview, Washington.  On

18 September 26, 2017, Ecology denied the CWA Section 401 certification entirely, based on

19 failure of Millennium to provide reasonable assurance that water quality standards would be met

20 and failure to comply with Washington's State Environmental Policy Act.  Columbia

21 Riverkeeper has intervened in state and federal court litigation to help defend Ecology's Section

22 401 certification denial.

23        29.    Sierra Club is one of the oldest environmental organizations in the United States.

24 Sierra Club is incorporated in the state of California as a Nonprofit Public Benefit Corporation

25 with headquarters in Oakland, California.  The organization has over 779,000 members

26 nationwide and local chapters across the country.  Sierra Club is dedicated to protecting and

27 COMPLAINT FOR DECLARATORY
28 AND INJUNCTIVE RELIEF

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

preserving the natural and human environment, and its purpose is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments.

30.     Sierra Club and its members regularly participate in state proceedings under Section 401.  Examples of Section 401 proceedings in which Sierra Club and its members are currently is engaged include the following:

- Review by the state of California of relicensing of hydroelectric dams,
- Review by the state of Alaska of a proposed copper, gold, and molybdenum mine,
- Review by the state of Minnesota of a proposed tar sands pipeline, and
- Review by the state of Oregon of a proposed liquefied natural gas export terminal.

31.     Sierra Club and its members have relied upon and continue to routinely rely upon the CWA Section 401.  In California, Sierra Club, through its participation in the Foothill Water Network, has participated in the Section 401 process regarding the Federal Energy Regulatory Commission's ("FERC") relicensing of the Yuba-Bear hydroelectric project.  Sierra Club submitted comments opposing the operator's request for a determination that California had waived CWA Section 401 authority and requested rehearing of FERC's determination of waiver. On August 17, 2020, Sierra Club appealed FERC's determination that California had waived CWA Section 401 authority to the 9th Circuit.  By seeking to preserve California's authority to impose conditions on this project, Sierra Club works to protect, *inter alia*, the interests of Sierra Club members who recreate in and on the rivers near the project's component dams.

32.     In Alaska, on August 24, 2020, Sierra Club submitted comments on an application for CWA Section 401 certification for the proposed Pebble mine, an open pit copper, gold, and molybdenum mine in the headwaters of the Bristol Bay watershed.  Sierra Club argued that there is no reasonable assurance the project will comply with water quality standards.  The Alaska Department of Environmental Conservation has yet to issue a decision on the application

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

for CWA Section 401 certification.  Sierra Club's work here supports the interests of Sierra Club members like Todd Radenbaugh, who fishes in and hikes and hunts around Bristol Bay.

33.     In Oregon, Sierra Club has been extensively involved in the CWA Section 401 process for the Pacific Connector Gas Pipeline and Jordan Cove liquefied natural gas export project.  Sierra Club submitted comments to the state of Oregon regarding the joint CWA Section 401 application on August 6, 2018.  Oregon denied certification in May 2019.  When the applicants later asked FERC to determine that this denial was too late and was therefore ineffective, Sierra Club, who was already a party in the pertinent FERC docket, submitted comments to FERC supporting the state.  This issue remains pending before FERC.

34.     In Minnesota, Sierra Club has been actively engaged in the review by the state of an application under CWA Section 401 for a proposed tar sands pipeline.  With its partners, Sierra Club submitted comments on the state's draft permit on April 10, 2020 and currently is an intervenor in an administrative hearing proceeding under state law to review specific factual questions about the pipeline's impacts to water quality and whether the project can be certified under Section 401.  Sierra Club members, including Jami Gaither, live and recreate along the pipeline's proposed route, which would pass through some of Minnesota's most pristine waterways and wetlands.

35.     When EPA proposed the challenged CWA Section 401 regulation, the Sierra Club submitted substantial and substantive comments.

B.     Overarching Interests

36.     EPA failed to conduct meaningful government-to-government consultation with the Suquamish Tribe, Pyramid Lake Paiute Tribe, and Orutsararmiut Native Council on the changes to the CWA Section 401 regulations, violating Executive Order 13,175, Consultation and Coordination with Indian Tribal Governments and EPA's policies regarding Tribal Consultation and Coordination and its Policy for the Administration of Environmental Programs on Indian Reservations.  EPA also has a legal obligation under the United States' general trust

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 11 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

responsibility to protect tribal lands and treaty-reserved resources, including the water that flows through and over tribal lands and the natural resources that depend on those waters. Tribal treaty rights are often dependent on clean water and productive ecosystems. EPA's changes to CWA Section 401 regulations undermine that trust responsibility and fail to address treaty rights.

37. If the Section 401 Rule is allowed to stand, all of the Plaintiffs and their members will suffer significant additional harm. The new rule leaves Plaintiffs and their citizens and members more vulnerable to environmental degradation because the new rule would limit review of projects to only a subset of the large number of environmentally harmful activities that currently are covered by Section 401. The scope of the review certifying authorities would be permitted to engage in, and the conditions certifying authorities could impose, would be far less comprehensive. As a result, far fewer federally permitted activities that could degrade the quality of state and tribal waters will be curtailed and mitigated. Plaintiffs' citizens and members will suffer from increased impairment of their local waterways and wetlands.

C.      Defendants

38. Andrew Wheeler, the Administrator of the U.S. Environmental Protection Agency, is sued in his official capacity. Mr. Wheeler has responsibility for implementing and fulfilling the duties of the EPA, including the administration of the CWA. Mr. Wheeler signed the CWA Section 401 Rule on June 1, 2020.

39. U.S. Environmental Protection Agency, a federal agency charged with administering the CWA.

## BACKGROUND

I.      SECTION 401 OF THE CLEAN WATER ACT

40. The overarching objective of the CWA "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

41. The Act protects waters from pollution, and from damage or destruction from dredging or filling, by prohibiting "the discharge of any pollutant by any person" except in

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
- 12 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

compliance with the Act's permitting requirements and other pollution-prevention programs.  *Id.* § 1311(a) (incorporating *id.* §§ 1312, 1316, 1317, 1328, 1342, and 1344).  The Act followed and sought to reverse years of failed efforts to protect and clean up the Nation's waters through the implementation of state-based water quality standards.  S. Rep. No. 92-414 at 7 (1971), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3672.

42.     Congress empowered regulators at both the federal and state level to pursue the Act's expansive aims through a number of mechanisms in line with a cooperative federalism framework.  *See U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 633 (1992); *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992).  For example, Congress established the National Pollutant Discharge Elimination System to require collaboration between states and EPA in the distribution of permits to point source polluters.  *EPA v. Cal. ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205–08 (1976).  Congress also included provisions in the Act allowing states to set standards for pollution, and to set requirements that exceed federal minimums.  33 U.S.C. §§ 1313, 1342(b), 1370.  Congress went so far as to remark that states have "the *primary* responsibilities and rights … to prevent, reduce, and eliminate pollution."  *Id.* § 1251(b) (emphasis added).

43.     Section 401 is an integral component of the CWA's larger cooperative federalism framework.  Section 401's "terms have a broad reach," *S.D. Warren Co. v. Maine Bd. of Envtl. Prot.*, 547 U.S. 370, 380 (2006), allowing states and tribes to exercise their regulatory powers to block federal licenses for activities that may result in discharges into navigable waters in their jurisdictions.  Specifically, states and tribes have discretion under Section 401 to deny certification or impose conditions on a federal license or permit.  The state or tribe with jurisdiction over the territory in which the discharge originates may deny or condition federal licenses pursuant to applicable effluent limitations guidelines, new source performance standards, toxic pollutant restrictions, and any other appropriate requirements of state or tribal law.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

44.     Once a discharge into navigable waters triggers the requirement for certification under Section 401, the conditions of certification need not specifically pertain to the discharge that triggered the certification process, but instead may apply to the activity of the applicant as a whole.

45.     Section 401 also provides the state or tribe with "a reasonable period of time (which shall not exceed one year) after receipt of such request" to act on an application under Section 401 before certification is waived.

46.     The CWA does not give the federal agencies unfettered discretion to set deadlines that prevent states and tribes from exercising their substantive authority under Section 401.  In limited, though not all, circumstances a state or tribe may request that an applicant withdraw and resubmit a certification application to restart the statutory reasonable period of time.

47.     Federal licensing authorities are bound to accept any conditions imposed upon their licenses by the state or tribe seeking to regulate water quality in its jurisdiction.  A federal licensing authority has no power to review a decision by a state or tribe to impose conditions upon a federal license or to deny certification to an applicant, although it may challenge such a decision in state or federal court.  Section 401(a)(1) provides that where a certification request is denied, "no license or permit shall be granted," although the federal agency may obtain judicial review of the state's or the tribe's decision.  Similarly, Section 401(d) denies federal permitting agencies authority to review the substance of state or tribal Section 401 conditions of approval, providing that any conditions a state or tribe includes in its certification decision "shall become a condition on any Federal license or permit subject to the provisions of this section."

48.     The 1987 Amendments to the CWA added provisions allowing EPA to treat federally recognized Indian tribes in a similar manner as states for certain provisions of the Act. 33 U.S.C. § 1377(e); 40 C.F.R. § 131.4.  Tribes that apply for and are granted TAS are authorized to implement Section 401 and other sections of the Act over tribal lands and waters, in keeping with EPA's longstanding policy encouraging tribal efforts to develop and administer

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 14 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

environmental programs.  *See* EPA, *EPA Policy for the Administration of Environmental Programs on Indian Reservations* (1984); *see also* "Revised Interpretation of Clean Water Act Tribal Provision," 81 Fed. Reg. 30,183 (May 16, 2016).

49.     In 1971, EPA promulgated the regulations that have governed the implementation of Section 401 since that time.

50.     In 2010, EPA supplemented these longstanding regulations with a handbook offering "a wide-ranging description of [Section 401] certification provisions and practices" to assist "states and tribes interested in using [Section 401] as an effective water resource protection tool."  The regulations and the guidance took an expansive view of states' or tribes' authority under Section 401, in line with the text and history of the statute, as well as judicial precedent. The broad authority of states and authorized tribes under Section 401 has remained unchanged by Congress or EPA for decades.

II.     REVISION OF CWA SECTION 401 REGULATIONS

51.     States and tribes rely heavily on Section 401 to prevent environmental degradation in their jurisdictions.  EPA acknowledges that from 2013 to 2018, an average of 4,266 individual and 58,766 general federal permits requiring Section 401 certification were issued per year.  This is an underestimate, as it accounts only for permits issued by the U.S. Army Corps of Engineers, the United States Coast Guard, FERC, and the Nuclear Regulatory Commission.  States and tribes issue 401 certifications for other federal permits as well.

52.     The Section 401 regulations and guidance have worked well across the board, allowing most applications for certification filed per year to be processed promptly.  As recently as last year, EPA conceded that "denials are uncommon" and that decisions on certification requests occur well within the period of envisioned by Congress.  When delays in processing Section 401 applications do occur, EPA concedes that it is most commonly because of "incomplete requests."

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

- 15 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

53.     On April 10, 2019, President Trump issued Executive Order ("EO") 13,868, the "Executive Order on Promoting Energy Infrastructure and Energy Growth."  The EO asserts that it is "the policy of the United States to promote private investment in the Nation's energy infrastructure" and instructs a number of federal agencies to take actions in line with that policy. One provision of EO 13868 instructs EPA to review its guidance and implementing regulations related to CWA Section 401.

54.     In accordance with the EO, on June 9, 2019 EPA rescinded the 2010 Handbook and replaced it with a new guidance document, which reinterpreted Section 401.  The document provoked backlash from stakeholders, including state attorneys general across the country, who stated that, if adhered to, the guidance would undermine the authority of states and tribes to protect themselves from environmentally harmful infrastructure projects under Section 401.

55.     On August 22, 2019, EPA published a Proposed Rule, titled "Updating Regulations on Water Quality Certification," which further demonstrated the agency's determination to curtail the regulatory powers of states and tribes under Section 401.  84 Fed. Reg. 44,080 (Aug. 22, 2019) ("Proposed Rule").  EPA received 125,000 comments on the proposed rule in the course of the next two months, including dozens of comments from states and tribes that raised concerns about federal overreach and the rule's potential to degrade the environment and harm communities within the jurisdictions of these certifying authorities.  On June 1, 2020, EPA finalized a substantially similar version of the Proposed Rule, retitled Clean Water Act Section 401 Certification Rule.  85 Fed. Reg. 42,210.

56.     EPA admits that its primary motivation in proposing and finalizing the rule is a desire to facilitate the construction of fossil fuel infrastructure.  This purpose is entirely divorced from Congress' intent in passing Section 401 and the CWA.  Executive Order 13868 directs EPA to promote the construction of energy infrastructure to transport "supplies of coal, oil, and natural gas" to market.  *See* 84 Fed. Reg. at 44,081–82.  Before the promulgation of the Proposed Rule Administrator Wheeler confirmed that its purpose was to "take action to accelerate and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 16 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

promote the construction of pipelines and other important energy infrastructure."  The Economic Analysis EPA published along with the proposed rule reflects the agency's intent by focusing largely on the alleged economic effects of state regulation of energy industry projects under Section 401 and ignoring any potential economic effects from degraded water quality caused by the limitations placed on state and tribal authority.  Upon the publication of the Final Rule, Administrator Wheeler reiterated that the Trump administration was motivated to revise Section 401 by a belief that certifying authorities "have held our nation's energy infrastructure projects hostage" and a desire "to put in place clear guidelines that finally give these projects a path forward."

57.    The Millennium Coal Terminal is one of the energy infrastructure projects the Trump administration cited to as justification for this rulemaking.  The Washington Department of Ecology determined that the coal terminal would destroy twenty-four acres of wetlands and five acres of aquatic habitat, as well as impair tribal access to protected fishing sites.  Ecology denied the CWA 401 certification on two grounds: first, that project proponents had failed to supply reasonable assurances that state water quality standards would be met, and second, that the certification should be denied under the Washington State Environmental Policy Act due to its significant and unavoidable environmental and public health risks and harms.  State and federal courts, in ongoing litigation, have upheld Ecology's 401 certification denial.

58.    The Trump administration cited the Constitution Pipeline as another example to justify the rulemaking.  The New York Department of Environmental Conservation denied certification for this pipeline after the applicant failed to provide the state with sufficient information to show that the project would not adversely affect 250 streams across the state, many of which are key to local ecosystems.  Project proponents' efforts to overturn New York's 401 certification denial were unsuccessful.

59.    EPA also attempted to justify its change in policy by raising perceived inefficiencies in the processing of Section 401 applications for fossil fuel infrastructure projects.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 17 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

1
2
3

84 Fed. Reg. 44,081–82; *see also* 85 Fed. Reg. 42,211, 42,223.  It does so in spite of the fact that many—likely most—of the thousands of annual permit decisions requiring Section 401 certification are for projects unrelated to coal, oil, and natural gas infrastructure.

4

III.    LACK OF ADEQUATE TRIBAL CONSULTATION

5
6
7
8
9
10
11
12
13
14
15
16
17
18

60.    On April 22, 2019—almost two weeks after the EO directing EPA to make changes to Section 401—EPA Assistant Administrator David Ross sent a letter to "all 573 of the Tribes federally recognized at that time," which announced the agency's intent to consult with tribes regarding its plans to revise its Section 401 regulations.  The brief consultation period formally ended approximately one month later on May 24, 2019, without EPA sharing the text or any details about its proposed changes and without any time for meaningful back and forth exchanges between tribal governments and EPA about what EPA had planned.  Two "Informational Webinars" were held for tribes in May 2019, but little information was provided by EPA in the webinars, and multiple requests for additional time for consultation were denied. Informal communication with tribes continued thereafter, but EPA released its proposed rule only two weeks later.  By the EPA's own admission "[c]onsultation was not done" with several tribes that made requests with the agency, including the Suquamish Tribe and Pyramid Lake Paiute Tribe, who both requested government-to-government consultation in their comments on the proposed rule, submitted October 21, 2019.

19
20
21
22
23
24
25
26

61.    Prior to promulgation of the deregulatory Final Rule described below, EPA had long acknowledged that "there is a gap in water quality protection under the CWA for waters on Indian reservations."  The Final Rule further diminishes the protections afforded to Plaintiff Tribes under the CWA, despite EPA's longstanding interpretation that Congress expressed a preference for tribal regulation of surface water quality on reservations to assure compliance with the goals of the CWA.  56 Fed. Reg. 64,876, 64,878–79 (Dec. 12, 1991).  The Final Rule's restriction of tribal authority to ensure that federal actions comply with tribal laws, combined with the lack of tribal consultation in promulgating the Rule, violate both EPA's stated policy to

27
28

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 18 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

work with tribes as sovereign entities with primary authority over their land and water resources and the duty to uphold the federal government's trust responsibility to tribes as expressed in treaties and the basic tenets of federal Indian law.

IV.     SIGNIFICANT RULE CHANGES

62.     As described below, the sprawling Final Rule reinterprets Section 401 to 1) limit the types of projects for which a certification application is required, 2) limit the scope of activities states and tribes may review in the course of the certification process, and 3) expand the role of federal agencies in determining how much time certifying authorities have to conduct their review of certification applications and whether the state or tribe has waived its authority to review a project under Section 401.  Cumulatively these revisions strip away a significant share of the authority Congress intended to delegate to states and tribes, leaving these local authorities far less capable of protecting their waters and their residents from environmental degradation resulting from federally licensed projects.

A.     Reducing the Number and Types of Projects for Which Certification Is Required

63.     In spite of the fact that the term "point source" is used nowhere in Section 401, the Final Rule states that an applicant only needs to seek certification for a project that results in a point source discharge.  85 Fed. Reg. 42,229–31.

B.     Narrowing the Scope of Certifying Authority Review

64.     For those projects that require Section 401 Certification, EPA reinterpreted the "scope" of Section 401 to limit the review of certifying authorities to a project proponent's discharges from point sources into the regulatory-defined waters of the United States.  *Id.* at 42,250–251.

65.     EPA stated that certifying authorities may only review an applicant's discharge under Section 401, rather than the activity of the applicant as a whole.  *Id.* at 42,251–53.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

66.     EPA failed to adequately explain how this narrowing of the scope of Section 401 conforms with the provision's essential purpose, which is to assure "that Federal licensing or permitting agencies cannot override state water quality requirements."

67.     EPA further asserted that in processing an application a certifying authority may only consider whether the point source discharge in question complies with "water quality requirements," which the regulations limit to those requirements outlined in sections 301, 302, 303, 306, and 307 of the CWA and the requirements of state and tribal laws and regulations that pertain specifically to point source discharges into waters of the United States.  *Id.* at 42,253–54. According to EPA, the sweeping language contained in Section 401(d), stating that a certifying authority must assure that an applicant complies with "any other appropriate requirement of state law," does not broaden the permissible scope of review beyond a discharge's compliance with this narrow subset of "water quality requirements."  *Id.* at 42,254–56.

68.     Under the Final Rule, conditions on federal permits or outright denials of certification must comply with the Final Rule's narrow interpretation of the scope of Section 401—*i.e.*, certifying authorities may place conditions only upon point source discharges in order to ensure compliance with water quality requirements and may deny only projects where a point source discharge violates water quality requirements.  *Id.* at 42,256.

C.     Expanding Federal Authority Over the Section 401 Process

69.     In the Final Rule, EPA substantially expanded the role of federal agencies in the states and tribes' Section 401 review process by significantly increasing federal authority to find that the certifying agency waived its Section 401 authority, suggesting restrictions on what information certifying agencies can request, and establishing additional procedural hurdles for certifying agencies.

70.     EPA gave federal licensing authorities broad discretion to set the length of the reasonable period of time to act on a given certification request.  *Id.* at 42,259–60.  The Final Rule requires the federal licensing agency to inform the certifying authority of the reasonable

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 20 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

period of time within 15 days of receipt of the certification request. *Id.* at 42,248. If the certifying authority disagrees with the amount of time it is given by the federal agency, the Final Rule leaves it without an appeals process, except to seek recourse through judicial review, which almost certainly would not provide relief within the time allotted. *Id.* at 42,260. The Final Rule also provides that no matter what circumstances certifying agencies encounter, including recalcitrant applicants or particularly risky or complicated projects, it is wholly within the power of the federal licensing agency—again, effectively without any recourse to any effective appeal—to decide whether a certifying agency will be given more time beyond what the federal agency initially provided. *Id.* at 42,260–61.

71.     The Final Rule categorically prohibits the certifying authority from requesting that an applicant withdraw a certification request or taking action independent of the federal licensing agency to extend the reasonable period of time. *Id.* at 42,260–62. EPA concluded that a waiver occurs even if the applicant voluntarily withdraws its application and submits a new application within the original one-year period, except if the project has been modified to the point of requiring a new certification request. *Id.* at 42,262. EPA did not define what kind of project change would be sufficiently significant to warrant submitting a new request that would restart the one-year clock, and gave the power to decide that question with the federal licensing agency. *Id.* at 42,267.

72.     The Final Rule further aggrandizes EPA's role by defining when the clock begins to run from the point when certifying agencies receive the materials EPA has determined are sufficient to commence review. The Final Rule sets a list of materials that starts the clock but fall far short of what is needed to begin a meaningful review. Notably, the Final Rule does not include a requirement that the applicant provide information on all of the project's potential impacts to water quality, information on the designation of the waterway receiving the discharge, or whether and to what extent the project might result in more than one discharge in the same waterway that could have cumulative effects. *Id.* at 42,244, 42,285–86.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

73.     The Preamble to the Final Rule also suggests that certifying agencies are limited to requesting information from applicants that can be "produced and evaluated within the reasonable time," rather than whatever the certifying agency, in its discretion, deems is needed to evaluate whether the project will comply with the CWA. *See id.* at 42,246.

74.     The Final Rule grants federal licensing agencies the power to declare that a certifying authority has waived its right to set conditions upon or deny an application. *Id.* at 42,263.  The federal licensing agency may use this veto power if a state or tribe fails to comply with detailed requirements—described by EPA as "procedural" requirements—when taking action to condition or deny a federal permit. *Id.* at 42,263, 42,267–68.

75.     Furthermore, against the precautionary spirit of Section 401, the Final Rule shifts the burden for proving compliance with these narrow water quality requirements from the applicant to states and tribes and gives the federal licensing agency additional power to find a waiver. *Id.* at 42,256.  If a certifying authority seeks to condition a permit, then the state or tribe must provide the federal licensing agency with an explanation in writing that the condition on a license is necessary to ensure that the relevant discharge is in compliance with those water quality requirements that fall within the narrow scope of review permitted by the Final Rule. *Id.* at 42,263.  In order to deny an application, a certifying authority must, in writing and complete with legal citations, explain why a discharge will not comply with the aforementioned water quality requirements, or, alternatively, describe the specific water quality data or information that the applicant failed to submit that would be necessary to ensure that the discharge complied with water quality requirements. *Id.*  In addition, the Final Rule does not require federal licensing authorities to allow states and tribes to remedy conditions and denials deemed deficient. *Id.* at 42,269.  Federal licensing agencies may review these written explanations, and, upon the discovery of a failure to follow EPA's newly-prescribed procedural requirements, may reject the certifying authorities' conditions and denials. *Id.* at 42,263.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF
- 22 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

76.     Even if a certifying authority were to make it through this gauntlet and successfully impose conditions upon a federal license, under the Final Rule, states and tribes lack authority to enforce any of their 401 certification conditions.  Instead, the federal permit, with its incorporation of state or tribal conditions, becomes the operative action.  *Id.* at 42,263.

## CLAIMS FOR RELIEF

### COUNT I
Violation of the Clean Water Act and the Administrative Procedure Act:
The Final Rule Is Contrary to the Clean Water Act

77.     The CWA's single objective is to restore and protect the physical, chemical, and biological integrity of the Nation's waters and to do so as broadly as possible.  33 U.S.C. § 1251.

78.     To achieve the Act's broad purpose, Congress expressly created a partnership between the states and authorized tribes on the one hand and the federal government on the other.  The Act gives states and tribes broad authority under Section 401 to review federal projects that may affect water quality within their jurisdictions.

79.     EPA cannot adopt regulations that are manifestly contrary to the text and purpose of the CWA and Section 401.  5 U.S.C. § 706(2)(A).  The Final Rule is contrary to law, because it upends the balance struck by Congress and seeks to carve out key aspects of powers given to the states and authorized tribes.

80.     EPA also exceeded its authority and acted contrary to the CWA, 33 U.S.C. § 1341, by adopting provisions in the Final Rule that (1) limit the scope of the states' and tribes' review over projects subject to Section 401 to pollution from point sources rather than the activity as a whole; (2) limit the ability of states and tribes to deny a certification except when there is no reasonable assurance that the discharge from a point source, rather than the activity as a whole, will comply with water quality requirements; (3) limit the conditions a state or tribe may include in a certification to ones that are related to water quality requirements and imposed on a discharge from a point source; (4) prevent states and tribes from enforcing Section 401

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

- 23 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

conditions; (5) give federal agencies the power to veto the decisions by states and tribes to condition or deny federal permits, (6) deny states and tribes the opportunity to ensure that they have a reasonable period of time to review an application for certification, (7) shift evidentiary burdens for proving compliance with relevant water quality requirements and local laws from the applicant for a federal license to the state or tribe.

81. EPA's adoption of the Final Rule is in excess of statutory authority and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A), (C).

COUNT II
Violation of the Clean Water Act and the Administrative Procedure Act:
Failure of Rational Decision Making

82. When promulgating regulations, EPA must articulate a satisfactory explanation for its actions, including a rational connection between the facts and the agency's choice. A regulation is arbitrary and capricious under the APA where:

> [T]he agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

83. EPA has for decades interpreted and implemented Section 401 in a manner that has been to the satisfaction of several successive presidential administrations, states, tribes, Congress, and the Courts. When an agency changes or amends its prior position, including its interpretation of a statute, it must provide an adequate explanation. A change in prior policy must be supported by a more detailed justification than a new rule crafted from scratch when claiming facts have changed or where there are reliance interests implicated by the policy change. Any unexplained inconsistency between the agency's prior position and its replacement is grounds for finding that the agency's interpretation is arbitrary and capricious.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

84.     EPA has presented no credible justification for dramatically changing its long-term interpretation of the scope of Section 401 or presented a sound justification for why the Final Rule will be more protective of water quality.  There are not pervasive delays stemming from the Section 401 process as it has been implemented without intervention by Congress for decades.  Facilitating the extraction of fossil fuels and the construction of energy infrastructure is an impermissible rationale for a reinterpretation of Section 401, contrary to the factors that Congress intended agencies to consider when rulemaking under the CWA.

85.     EPA's adoption of the Final Rule was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A), (C).

COUNT III
Violation of Responsibilities to Tribes

86.     The United States has a trust responsibility to protect Indian lands, resources, and other interests.  The trust responsibility is a legally enforceable fiduciary duty that arises out of a number of sources of law, including treaties, statutes, Executive Orders, and the common law.  In carrying out the federal trust responsibility, EPA must ensure that tribal resources are protected and that tribal concerns and interests are considered before an agency takes action that will impact tribal interests.  On- and off-reservation fishing rights that are protected by treaty, rights to water necessary to fulfill the original purpose of the reservation, and the right to subsistence resources are protected interests of the Plaintiff Tribes.

87.     EPA's trust responsibility includes the duty to meaningfully consult with tribes prior to promulgating a rule that affects tribal interests.  EPA is required to adhere to "an accountable process" for consultation with tribes.  Consultation should occur early enough to allow tribes to provide input prior to the promulgation of a proposed rule and should continue throughout the rulemaking process.  A series of meetings between a Tribe and EPA may be required over the course of the rulemaking process.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

88.     In promulgating the Final Rule, EPA failed to meaningfully consult Plaintiff Tribes.  The responsibility to provide meaningful consultation is reflected in and incorporated into internal EPA policy documents, such as "EPA Policy for the Administration of Environmental Programs on Indian Reservations" and "EPA Policy on Consultation and Coordination with Indian Tribes."

89.     EPA's decision to adopt the Final Rule without meaningfully consulting with Plaintiff Tribes; its failure to comply with its own policies and procedures relating to its responsibilities to tribes when promulgating the Section 401 rulemaking; and the agency's failure to analyze how the Final Rule and its implementation will affect tribes is arbitrary, capricious, and contrary to law, in violation of the APA, 5 U.S.C. § 706(2)(A), (C).

### REQUEST FOR RELIEF

Plaintiffs respectfully request that the Court:

A.     Adjudge and declare that the Section 401 Rule is arbitrary, capricious, an abuse of discretion, and not in accordance with law;

B.     Vacate and set aside the Section 401 Rule;

C.     Enjoin EPA from applying or otherwise relying upon the Section 401 Rule;

D.     Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorney's fees; and

E.     Grant Plaintiffs such additional and further relief as the Court may deem just and proper.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

DATED this 31st day of August, 2020.

Respectfully submitted,

*/s/ Kristen L. Boyles*
KRISTEN L. BOYLES (CA Bar #158450)
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA  98104
(206) 343-7340
kboyles@earthjustice.org

GUSSIE LORD (D.C. Bar # 1009826)
*[Pro Hac Vice Application Pending]*
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
(720) 402-3764
glord@earthjustice.org

MONEEN NASMITH (NY Bar # 4427704)
*[Pro Hac Vice Application Pending]*
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(212) 845-7384
mnasmith@earthjustice.org

THOMAS S. WALDO (AK Bar # 9007047)
*[Pro Hac Vice Application Pending]*
Earthjustice
325 4th Street
Juneau, AK 99801
(907) 500-7123
twaldo@earthjustice.org

*Attorneys for Plaintiffs*

NATHAN MATTHEWS (CA Bar #264248)
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5695
nathan.matthews@sierraclub.org

*Local Counsel and Attorney for Sierra Club*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*